NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200146-U

NO. 4-20-0146

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 25, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Respondent-Appellee, | ) | Circuit Court of |
|     v. | ) | Macon County |
| JEREMIAH CAMPBELL, | ) | No. 06CF143 |
|     Petitioner-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) Defendant failed to establish the trial court, after an evidentiary hearing, erred in rejecting his postconviction claim of actual innocence.

(2) The trial court did not err in finding defendant failed to prove his ineffective-assistance-of-counsel claim.

(3) The trial court did not err in dismissing defendant's claim of a *Brady* violation at the second stage of proceedings.

¶ 2   Defendant, Jeremiah Campbell, appeals the circuit court's denial of his petition

for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(f) *et seq.* (West

2014)). On appeal, defendant argues the trial court erroneously (1) found the new evidence of

actual innocence, expert testimony, and supporting documentation showing the victim's injuries

were consistent with those expected from untrained cardiopulmonary resuscitation (CPR) and

with witness statements defendant performed such efforts on the victim, was not of such conclusive character as to change the result on retrial; (2) determined he was not denied the effective assistance of counsel; and (3) denied, at the second stage of proceedings, his claim of a violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1967). We affirm.

¶ 3                                     I. BACKGROUND

¶ 4            In January 2006, defendant was charged with five counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) of Galen (born May 23, 2004), the 19-month-old son of his girlfriend, Ebony Brady. According to the State, the injuries causing Galen's death occurred a few hours before his death when Galen was alone with defendant. According to defendant, Galen's injuries occurred earlier, while in another's care. Defendant's first trial ended with a hung jury and a mistrial.

¶ 5            In February 2011, after a jury trial, defendant was found guilty of first degree murder. He was sentenced to 60 years' imprisonment. Defendant appealed his conviction, alleging the State failed to prove him guilty beyond a reasonable doubt as the only reasonable expert testimony established Galen's fatal injury could not have occurred when defendant was alone with Galen. Defendant also alleged the trial court erroneously denied his posttrial motion for an evidentiary hearing on the issue of a juror's impartiality. We affirmed defendant's conviction. *People v. Campbell*, 2013 IL App (4th) 110517-U, ¶ 2. For purposes of resolving defendant's allegations of error in this appeal, we need not summarize the evidence in detail. A more complete summary of the evidence at defendant's trial is found in the disposition of his direct appeal. See *id.* ¶¶ 6-106.

¶ 6            At defendant's February 2011 trial, three forensic pathologists, Dr. Jessica

Bowman, Dr. John Ralston, and Dr. Mary Case, offered expert testimony on Galen's cause of death. All agreed injury to Galen's liver caused or contributed to his death. They disagreed as to the time the injury occurred. While Dr. Bowman and Dr. Case concluded the fatal injury occurred within three hours of Galen's death, Dr. Ralston concluded the liver injury was older, occurring up to two days earlier. All agreed the injuries were not caused by resuscitation efforts.

¶ 7　　　　The testimony of the Macon County coroner, Michael Day, explains how the forensic pathologists were involved in the case. Dr. Bowman was hired as a coroner's physician for Macon County. She had worked with the retiring coroner's physician but was not board certified after having failed the certification exam multiple times. Coroner Day testified relations appeared "strained" between Dr. Bowman, law enforcement, and the state's attorney's office. Concerns had been voiced to him. When Dr. Ralston, a board-certified forensic pathologist, stated he was moving to the area, Coroner Day replaced Dr. Bowman. Dr. Ralston had worked for several counties and often testified as an expert for the State. Coroner Day had no "qualms about Dr. Ralston's quality of work or his professional demeanor." After defendant secured an expert opinion report by Dr. Ralston, who was not yet acting as the coroner's physician when he wrote the report, Dr. Case was hired to review the conclusions of Dr. Bowman and Dr. Ralston.

¶ 8　　　　Dr. Bowman testified she was a forensic pathologist who obtained a permanent license in 1998 or 1999. She graduated from Indiana University School of Medicine in 1993, and her residency in pathology was completed at Methodist Hospital of Indiana in 1998. During her residency, Dr. Bowman had a rotation in pediatric pathology. Dr. Bowman completed a fellowship in forensic pathology at Indiana University School of Medicine. Dr. Bowman was licensed to practice in four states, including Illinois. Dr. Bowman testified she averaged 250 to

300 autopsies per year. Although she was not board certified as a forensic pathologist, Dr. Bowman was a board-certified anatomic and clinical pathologist.

¶ 9 According to Dr. Bowman, she conducted an autopsy of Galen one day after his death, January 21, 2006. Bruising was scattered across Galen's chest and abdominal region. There was also bruising on Galen's forehead and in the area below his eyebrows. Dr. Bowman stated the abdomen and chest area exhibited "numerous circular bruises, some of which [were] almost confluent of a pattern *** recognizable as that characteristically seen when caused by a fist." Galen's right arm had "faintly demonstrated marks," which could have been caused by a fist or by the act of grabbing. Dr. Bowman's internal examination revealed evidence of traumatic injury. Damaged blood vessels hemorrhaged into Galen's abdominal cavity, buttocks, back, and lung. Galen suffered two broken ribs on each side. There was no evidence of healing, indicating the ribs were recently injured. Dr. Bowman found subdural blood in the area surrounding the brain. This blood, however, indicated an injury that was not lethal to Galen.

¶ 10 Regarding Galen's liver, Dr. Bowman testified Galen suffered a hemorrhage in the liver's midregion. The liver was separated, causing bleeding. The capsule surrounding the liver was torn: "[m]ostly intact with a little bit of tearing." The capsule showed no indication of healing, as the tear had "no piling up or evidence of distortion." Most of the damage to the liver was on the inside of the liver. Dr. Bowman believed the injury to the liver was recent.

¶ 11 Dr. Bowman opined Galen's death was due to blunt-force injury that appeared to be "contemporaneously inflicted" within, at most, a couple of hours. Dr. Bowman based her opinion on the appearance of the injuries, as well as the microscopic appearance of the injuries. Regarding her microscopic observations, Dr. Bowman explained blood contains inflammatory

cells that attempt to repair tissue. While inflammatory cells were present, those cells had not yet begun to react with the tissue. This indicated Galen's injuries were recent. Based on the extent of Galen's injuries, Dr. Bowman opined he would have lived "maybe a couple hours" after having sustained them. She opined to the following: "Looking at the sum total of injuries that this child has and the broken ribs, the lacerated liver, the hemorrhage in the mesentery, I would expect things like respiratory difficulty and shock to take the life of this child within at least a couple of hours and, perhaps, sooner." Dr. Bowman doubted Galen could have walked around after having suffered such injuries. Emphasizing Galen's buttocks and head injuries, Dr. Bowman believed Galen's injuries could not have been caused during resuscitation efforts.

¶ 12     Dr. Bowman agreed a review of the tissue slides could reveal an injury occurring 12 hours before but stated such a conclusion would be made without consideration of the broken ribs, the hemorrhage in the deep soft tissues, and evidence of shock.

¶ 13     Dr. Ralston testified he had been licensed in forensic pathology since 2003. He graduated from medical school at East Tennessee State University. Dr. Ralston's residency was in anatomic and clinical pathology at Rush University, and his one-year pathology fellowship was at Cook County Medical Examiner's Office. Dr. Ralston was board certified in anatomic and clinical pathology, as well as in forensic pathology. In July 2008, Dr. Ralston was hired as the coroner's physician for Macon County. Dr. Ralston occasionally accepted private autopsy cases and reviewed the work of others. In his career, he had performed approximately 1100 autopsies. In this case, Dr. Ralston was hired by defendant to review Dr. Bowman's findings and render an opinion.

¶ 14     According to Dr. Ralston, in October 2009, he received materials relating to

Galen's death. These materials included Dr. Bowman's autopsy report, photographs taken at the hospital, and Dr. Bowman's testimony at defendant's first trial. Dr. Ralston also reviewed microscopic slides from Galen's autopsy.

¶ 15    Dr. Ralston opined Dr. Bowman failed to estimate or opine on the age of the fracture or hemorrhage injuries. According to Dr. Ralston, it was useful, particularly in subdural-hematoma cases, to take a microscopic section of the clotted blood to determine the age of a hemorrhage. As a hemorrhage builds, the blood would pool and the body would attempt to organize a clot by turning it into fibrous tissue and dispose of it. To determine the maturity of a clot, one could examine the clot microscopically. Here, such a test was not done.

¶ 16    Dr. Ralston concluded the injury that caused Galen's death more likely occurred a couple of days before his death. Dr. Ralston agreed it was possible the injury was just two to three hours old but the presence of dead tissue in the liver supported his conclusion the injury was older—one to two days old at the time of Galen's death. Dr. Ralston based this decision, in part, on the photographs from Galen's autopsy. Dr. Ralston stated one could see tissue damage with a recent hemorrhage as well as an area of tissue that turned "yellow-tan," indicating a loss of blood supply to that area and necrosis. Dr. Ralston further observed microscopically a prolonged immune response dealing with long-term consequences. A macrophage is a white blood cell that responds to specific types of infections and tissue damage. The macrophage response was predominant in the liver, further supporting his conclusion the damage to the liver was one to two days old. In addition, some of the rib fractures also appeared to be a few days old, while the others were a few hours or few minutes old.

¶ 17    Dr. Ralston opined the injury to Galen's liver was the most serious injury to

Galen and blunt-force trauma from an assault was Galen's cause of death. Dr. Ralston testified the pain of the liver injury would have been "probably of a diffuse nature." Galen would be tired and not feeling well but could have remained mobile, even eating and drinking "somewhat." Dr. Ralston opined ibuprofen, which testimony established Galen had been taking, could have masked Galen's pain.

¶ 18　According to Dr. Ralston, Galen's injuries were not like those typically seen from CPR efforts. Galen's injuries were more consistent with abuse.

¶ 19　Dr. Case, a pathologist, testified she attended medical school at St. Louis University and had been licensed to practice medicine in Missouri since 1969. Dr. Case's residency, which she completed in 1973, was in pathology at St. Louis University hospitals. Dr. Case completed a fellowship in neuropathology, the study of disease and injuries of the nervous system. Dr. Case was board certified in anatomical pathology, neuropathology, and forensic pathology. At the time of her testimony, Dr. Case served as a medical examiner for St. Charles County, Jefferson County, and Franklin County, Missouri. Dr. Case worked directly for St. Louis County as their chief medical examiner since 1988, and she traveled around the country giving lectures and teaching regarding death investigations. Dr. Case personally performed "somewhere around 11,000 autopsies," including several hundred on children. She testified as an expert in pathology several hundred times. Dr. Case was retained by the Macon County state's attorney's office to review Galen's death.

¶ 20　After reviewing the autopsy report, the autopsy photographs, the microscopic sections, Dr. Ralston's report, Dr. Bowman's testimony from defendant's first trial, police department records, hospital records, and Galen's other medical records, Dr. Case opined Galen

died from blunt-force trauma and was the victim of homicide. Based on the bruises on Galen's chest, Galen was struck by fists. Galen's liver injury was the kind of injury seen in motor-vehicle accidents. His injuries could not have been caused by another child or by resuscitation efforts.

¶ 21        Dr. Case disputed Dr. Ralston's conclusions. Dr. Case testified, based on her microscopic observations, the ages of the injuries were identical. She noted, however, not all of Galen's injuries were examined microscopically. According to Dr. Case, the type of injury inflicted on Galen's liver usually caused death within an hour. Dr. Case opined the injuries to the liver, as well as the rib injuries, would have caused "very considerable pain." Galen would have been unable to eat. He would remain conscious but not be able to run around and play. Galen's pain would not have been decreased or masked by over-the-counter medication. Dr. Case testified the bruises on Galen's chest resembled knuckle marks.

¶ 22        Dr. Case testified the physical appearance of Galen's liver in the photograph revealed nothing about the injury's age. She could not determine from the photograph whether necrosis existed in the liver. While the liver injury appeared "fresh," Dr. Case explained the only way to determine the age of the liver injury was to examine it microscopically. When she examined a slide containing liver tissue, Dr. Case observed individual liver cells and neutrophil cells. Neutrophils, a type of white blood cell, aid in the inflammatory process. They cause a rise in body temperature and are present in a liver within 20 minutes of an injury. The influx of neutrophils is "one of the very earliest things to happen" after an injury. Dr. Case observed neutrophils in small numbers. Macrophages, cells that engulf dead tissue and bacteria and remove them, occur later in the inflammatory process, usually in the second or third day after an injury. Dr. Case observed no macrophage cells in Galen's liver. Dr. Case testified, if Galen's

injury had been present for several days, there would have been "many more neutrophils" and an influx of macrophages but Galen's "liver does not show that."

¶ 23        Additional testimony at trial included testimony from a police detective who interviewed defendant at the hospital on the day of Galen's death. Defendant reported having attempted CPR on Galen after he was found unresponsive. The State also introduced defendant's testimony from the first trial, at which defendant testified he, with no medical training, attempted CPR by giving Galen mouth-to-mouth resuscitation and pressing on Galen's chest. He also explained he drove to the hospital while attempting to revive Galen. Ebony testified, after she discovered Galen was not breathing, defendant picked up Galen, began shaking him, and attempted to give him CPR.

¶ 24        In April 2015, defendant filed his *pro se* petition for postconviction relief. After 90 days lapsed, the trial court docketed the petition for further postconviction proceedings. An amended petition was filed in January 2018. In this petition, defendant asserted multiple claims. After the State moved to dismiss defendant's postconviction petition, the trial court ruled it would advance to the third stage of proceedings defendant's claims of actual innocence based on new CPR evidence and of ineffective assistance of trial counsel. The trial court refused to advance to the third stage defendant's *Brady* claim, in which defendant asserted the State failed to disclose information regarding Dr. Bowman's competency.

¶ 25        At the evidentiary hearing, defendant called Thomas Young, a licensed forensic pathology consultant. Dr. Young graduated from Loma Linda University School of Medicine in Loma Linda, California. After medical school, Dr. Young completed a four-year residency in pathology. He was board certified in anatomic, clinical, and forensic pathology. Dr. Young

worked for 11½ years as the chief medical officer in Jackson County, Missouri, the "metropolitan Kansas City." Dr. Young, in January 2007, began a consulting practice as a forensic pathologist. Dr. Young had performed approximately 5600 autopsies and had testified approximately 500 times.

¶ 26    For this case, Dr. Young testified he was hired by defendant to review Galen's death. Dr. Young reviewed Dr. Bowman's autopsy report, the photographs of the autopsy, the report by Dr. Ralston, the photo micrographs of the slides from the autopsy, police investigative reports, photographs of the scene and the child, and the trial transcripts of the testimony of Brady, defendant, Dr. Case, Dr. Ralston, and Dr. Bowman. Dr. Young did not recall seeing in the expert reports or in the transcripts of the proceedings any mention of defendant's performing CPR on Galen. Regarding the autopsy report, it did not describe blood in the abdomen. The photographs of the autopsy revealed only a tiny amount of blood. According to Dr. Young, if the heart was active and there was blood pressure when the liver injury occurred, more blood would have been found in the abdomen. Dr. Young testified the liver "is a very vascular organ." For an infant or small child, a child must lose 50 percent of his or her blood volume to die. If there was a gaping laceration to the liver and the child died from blood loss, "there's going to be copious blood coming out of the belly." If, however, the child had no blood pressure or very little blood pressure due to chest compressions, a tiny amount of blood would likely end up in the same body cavity. In the cases Dr. Young examined, in those circumstances, "maybe as much as 10 percent but not more than that usually." According to Dr. Young, the small amount of blood loss indicates there was little to no blood circulation when the liver was lacerated.

¶ 27    Dr. Young did not form an opinion on Galen's cause of death, but he concluded it

was possible, however, Galen's injuries could be attributed to improperly performed CPR. According to Dr. Young, the small amount of blood loss indicates there was little to no blood circulation when the liver was lacerated. Dr. Young explained the difference between adult and child CPR. For adults, CPR compressions are made by "placing the hand over the sternum and *** pressing up and down about a hundred times a minute." For children, one should not use "the two-hand thing on the sternum" but use "two fingers." The amount of pressure or vigor differed. Dr. Young opined "forceful adult-style CPR improperly performed by an untrained person on an 18-month child can lead to the injuries described in" Galen's autopsy. The bruises could have been caused by the heel of the hand being placed and shifting along the anterior midline during CPR compressions. Dr. Young opined the liver lacerations on the midline could have been "caused by rapid violent compressions that squeezed the liver repeatedly against the spine." Dr. Young testified the compressions of one hundred times per minute changes "the shape of that body cavity and [presses] the liver there against the spine, which protrudes into that abdominal cavity." Vigorous compressions, that kind of squeezing, "can cause these serious kinds of both external and internal liver lacerations" and "fracture ribs."

¶ 28        Dr. Young was aware that the literature indicates CPR does not cause rib fractures in children. Dr. Young described his concerns about that literature:

> "Much of the literature that you're talking about has what
> you would call a circular[-]argument problem. That, basically,
> means where you accept as a premise the thing that you're trying
> to conclude. So what ends up happening here is that in cases where
> they, basically, say we haven't seen any cases in children where

- 11 -

there are any rib fractures, or we haven't seen any cases in children where there are any liver tears, or we haven't seen any cases in children where there's any significant damage from CPR, well the problem with that is because those cases that do have the problems, they've already termed those as child abuse and so they are removed from consideration.

So all they have is, well, we haven't seen any case where CPR has caused any significant injury to a child. You can see how if you've already called those out because you decided in advance that those were caused by child abuse, that that would have a profound and even disturbing impact there on—on the CPR literature. In adults, seeing rib fractures and seeing liver tears from adult-style CPR, these are commonly seen.

But it's amazing here in that in the child or in the infant in which they are very tiny, and not nearly as robust as an adult, hardly anybody ever describes these things. They don't say we don't see any rib fractures in children or we don't see liver tears. Okay. Well, it's because the cases where there are rib fractures and liver tears they've already determined them to be child abuse, and they are taken out of the study."

¶ 29    On cross-examination, Dr. Young testified he made no determination for Galen's cause of death as there was insufficient information to make that kind of determination. Dr.

Young testified, "The situation is that this was a sudden and unexpected death. The reason for the sudden and unexpected death is unexplained." Dr. Young mentioned in his report there was not a sufficient explanation for Galen's breathing issues before his death, which accompanied an illness he had for three to seven days. There could have been inflammation of the heart muscles as a result of a viral respiratory illness. The tonsils and adenoids, which had been described as enlarged and possibly needing surgery, were not described in the autopsy. In such cases, it is relatively common not to find anything at the autopsy. Dr. Young estimated he had experienced such a situation in fewer than five cases.

¶ 30        Dr. Young testified CPR was described in the police reports as having taken place. While Ebony called 9-1-1, defendant performed CPR. Someone observed this. As for child abuse, no one observed it. It was something that was "theoretical and hypothetical." Dr. Young opined the following: "There are a lot of forensic pathologists who have very, very little information from witnesses. They simply look at the autopsy report and they draw a conclusion from what they see at the autopsy. If the injuries look really bad to them, they're going to call it child abuse. This happens frequently, and it is unfortunate that it does." Dr. Young advised one cannot look at autopsy findings and imagine a scenario. The appropriate approach "deductively and logically and reasonably is to listen to the people who were there to see what happened and test what they saw by the autopsy findings."

¶ 31        Dr. Young testified he had one case in which he saw injuries like Galen's that were the result of CPR. Dr. Young testified the child was less than one year old. The child had coin-shaped bruises on the chest and abdomen like those seen on Galen. There were numerous rib fractures, the heart and lungs were "very bloody," and the liver was "smashed." The heart

appeared bruised, and there was "very, very little fluid blood in any of the body cavities." Dr. Young relayed to a detective that the small amount of blood made little sense as there was no bleeding or hardly any bleeding. The detective mentioned the child was found in a crib and a neighbor "who was so very, very upset took the—picked up the child, took the child outside, put the child on the hood of the car in front of all these witnesses, and started just wailing on the child with real, real severe adult-style CPR." The woman had to be restrained. In these circumstances, the suspect fled the scene. He denied harming the child. The person who followed Dr. Young called it child abuse. The suspect was arrested.

¶ 32        Dr. Young re-emphasized his concerns about the literature on CPR studies, as cases identified as "child abuse" are removed from consideration. Dr. Young stated "when you have so many injuries that occur in adults from adult-style CPR, it shouldn't be any stretch or leap of the imagination to imagine that if you were to do the same kind of CPR on an infant or small child, that you'd probably have even worse injuries than you would see in an adult. *** So to have a situation where you have no injuries, that's a red flag, that's suggesting a problem with the study itself." What happens in these studies is the details are ignored. They jump to the conclusion of child abuse without carefully looking at witness accounts.

¶ 33        According to Dr. Young, CPR takes into account that an infant or small child is not as robust, as for an adult we are taught to "use two hands and really push, but not on the infant." Dr. Young was not told whether defendant performed adult-style CPR or CPR for a child. Dr. Young concluded the witness account is consistent as if defendant "were to perform adult-style CPR on that child, that would be the kind of finding that you would have."

¶ 34        Regarding his opinion of Dr. Case, Dr. Young testified Dr. Case looks at autopsy

findings to imagine what led to those findings rather than looking carefully at what witnesses said. He opined, when Dr. Case sees horrible injuries, she concludes "it's got to be child abuse." Dr. Young believed Dr. Ralston did the same thing. Dr. Young opined, if one believes there was child abuse, he or she is not going to agree CPR caused the injuries.

¶ 35 Dr. Case testified at the evidentiary hearing. According to Dr. Case, Galen had extensive injuries that led to his death:

> "He's got primarily a very large laceration of the liver, but he's got hemorrhage in the capsule of the spleen. He's got hemorrhage in the mesentery of the lesser curvature of the stomach and in the large bowel at the cecum and around the pancreas. He has a lot of deep hemorrhaging in the muscle around the right pelvic region. So those are the injuries in the abdomen. So there are other injuries to the body in addition, but those are the ones that are most significant in producing his death."

Galen also suffered rib fractures that can be inflicted by striking the child or by squeezing.

¶ 36 When asked the reason Dr. Case opined Galen was the victim of homicide, Dr. Case stated, "There was not an accidental mechanism to account for these rather extensive traumatic injuries, so basically that was the reason." Dr. Case further pointed to the marks on Galen's body that looked like knuckle marks.

¶ 37 Dr. Case opined Galen's injuries would not have resulted from CPR. Dr. Case opined "[w]e have a lot of children that we autopsy, and almost everybody has had CPR, and we don't observe these kinds of injuries in those children." None of the children showed those types

- 15 -

of injuries: "They get resuscitated and nobody has any of these injuries. If you look at children that are dying from homicidal blunt trauma of the abdomen, not all of those children have resuscitation. So there is a literature that kind of divides out, well, here are the ones that are resuscitated. Do they look different? And they don't. They look the same." Dr. Case reported there was no new literature showing injuries resulting from resuscitation and all of the literature supported her conclusion. She further testified "there is even more literature that supports that opinion today than there was earlier."

¶ 38        Dr. Case testified the injuries seen in adults from CPR are not seen in children. While children may be more delicate in certain ways, adults have fixed tissue, and it was very common to see rib fractures in adults. Children were more pliable.

¶ 39        Because Dr. Bowman did not measure the fluid found in Galen, Dr. Case was unable to determine how much blood Galen lost as a result of his injuries. Dr. Case opined the autopsy photographs reveal "a very liquid blood in the abdominal cavity" and "in the soft tissue *** there is a lot of soft tissue hemorrhaging[.]" The microscopic sections taken from the liver show, when the injury occurred, Galen was alive as "the body's inflammatory reaction to it occurred."

¶ 40        Dr. Case was familiar with Dr. Young. She disagreed "with his ideas about his theory of if you have injuries and you have a witness statement and they match, that you have to believe it because the injuries always seem to match." Dr. Case testified to an incident leading to his removal "from the list of doctors that could do autopsies on children in the State of Missouri":

"At one time [Dr. Young] did autopsies in the State of

Missouri, and there came a time when he presented a case on that in November to this child death pathology group that his reasoning—he had a very dreadful—and it was an abdominal injury, looked very much like this child. And he showed it—or there were rib fractures, an extensive liver laceration, and many marks all over the body—that this was from resuscitation, and the entire group kind of rose up. And I took it to the State of Missouri, and he was removed from the list of doctors that could do autopsies on children in the State of Missouri."

¶ 41        Dr. Case denied that conclusions are drawn about cause of death simply from the physical state of the body. Dr. Case testified when there is a death, particularly of a child, "we" look at the autopsy, the photographs, the stain photographs, the microscopic, the medical history from birth, and police reports, including witness statements. Dr. Case further discussed a study that examined 33 cases of abdominal trauma. Twenty-four of the cases had resuscitation, while nine did not. When the 9 were compared to the 24, "they didn't look any different." Dr. Young's conclusion the literature is faulty "doesn't hold."

¶ 42        Dr. Case testified CPR performed on children over one year of age is done with two hands. On infants, CPR is performed with two fingers.

¶ 43        On cross-examination, Dr. Case was asked if there is a difference between CPR performed by someone trained in CPR and CPR performed by "a 200-pound healthy man high on adrenaline trying to get a child to breathe, not knowing how to perform CPR." Dr. Case testified "[t]here's no difference between trained and untrained." Dr. Case testified "when they

- 17 -

compared nontrained and trained, they did not get any difference."

¶ 44        Dan Fultz, defendant's attorney during his second trial, testified regarding his representation of defendant. Early in his representation, Fultz met with Dr. Ralston and told him he "needed to pick a path and *** needed some guidance on where I thought I had the best opportunity." Fultz was concerned about explaining Galen's older bruises. Dr. Ralston informed Fultz he need not worry because the tissue slides indicated healing of the liver had already begun by the time Galen died. Dr. Ralston told him, because the macrophage cells were present, the timing of that injury could not have occurred while Galen was in defendant's care. After this conversation, Fultz developed his trial strategy.

¶ 45        Fultz recalled defendant telling him he performed CPR on Galen at the home. Defendant reported he was not trained in CPR but had performed chest compressions. Defendant was frantically trying to get Galen to breathe. Fultz recalled one of the issues in the case was that Galen had a history of breathing issues. Dr. Ralston told Fultz he did not believe the injuries could have resulted from CPR. Dr. Fultz testified as to the reasons he did not pursue CPR as a theory of the case:

> "[T]he real reason would be that I didn't want to confuse other issues with my theory of the case, and Dr. Ralston had told me that he did not think the injuries could have resulted from—from CPR.
>
> I knew the other experts were going to testify in the same manner, and so I didn't want to raise an issue as a red herring that would confuse the jury because my whole theory was I don't care

how the injuries got there, he didn't do it. It wasn't the timeframe, the right timeframe for the injuries to have occurred, so I just didn't raise it because I didn't need to. It wasn't consistent with my theory."

Fultz further testified other injuries Galen suffered, such as injuries to his head and bruises, could not be explained by CPR.

¶ 46　　　　Fultz was convinced Ebony killed Galen. He testified regarding his concerns about the case:

"There were things about the case that bothered me very much, and even to this day, and one of those things that kept jumping out at me was the mother's behavior during the course of the emergency. I was troubled by the fact that she came home early from work without any real explanation as to why she came home.

I was troubled by the fact that she had explained away some injuries on the child earlier in the week when [defendant] had raised those issues with her.

I was troubled by the fact that she did not go in and check on her child, that she sent the family member who came home with her from work to check on the child.

I was concerned about the fact that when the baby was in distress, she didn't grab the baby up. She didn't hold the baby. She didn't try to console the baby. She didn't try to do any CPR.

- 19 -

[Defendant] held the baby all the way to the hospital. Even at the hospital the evidence was that was mom would not touch the baby, and I could not get my mind around that fact, that I just couldn't understand how a mom—I couldn't understand that—how a mom could not touch her baby in distress and not want to physically be with it.

And that, in conjunction with talking to [defendant] repeatedly and looking at the discovery and all the things that we did, talking to Dr. Ralston, I just did not believe, firmly did not believe that [defendant] killed this baby, and I was determined to find something that would allow the jury to hang their hats on that as an outcome, because as much as I hate to say this as an officer of the court, as a defense attorney, when you're trying a case involving a dead child, I don't believe the presumption of innocence is as strong as it is in other cases. *** I needed to prove something. I needed to prove his innocence. And I was struggling to figure out how I could do that when it was just his word against the mother's word, and when Dr. Ralston looked at the liver tissue slides and he found those macrophage cells, that was what I was looking for and that's how I—that's how I—I adopted that strategy."

Fultz admitted he did not anticipate how Dr. Case "got up and basically ridiculed Dr. Ralston and

said that that was no macrophage cell, and there's no way in the world that was a macrophage cell, and she was way smarter than him."

¶ 47        Regarding Dr. Bowman, Fultz testified he was aware she failed the forensic-pathologist exam multiple times. He was further aware she had "diagnosed a young kid in Springfield with a medical condition that was, like, so rare that it was almost unheard of." In addition, when the defense was trying to get the liver-sample slides from the State, it took months. The State admitted they did not know where the slides were. Ultimately, they were found in Dr. Bowman's personal refrigerator. He knew the Sangamon County state's attorney had asked the coroner to fire Dr. Bowman. Dr. Bowman was "kind of the laughing stock of the forensic science community for a while."

¶ 48        The circuit court entered a written order in February 2020. The court concluded "Dr. Young did not have an opinion on the cause of death of the child but did testify that it was possible that a forceful adult[-]style CPR improperly performed could lead to the injuries discovered in the autopsy." The court stated it, after reviewing the medical literature and the testimony of Drs. Young and Case, found the medical literature was not "of such a conclusive character [it] would probably change the results at re-trial." As to the effectiveness-of-counsel claim, the court found Fultz was "extremely prepared" for trial and pursuing a defense the injuries were older, given Dr. Ralston's testimony, was sound trial strategy. The court found Fultz's representation did not fall below an objective standard of reasonableness and no reasonable probability the outcome of the trial would be different had defendant retained an expert like Dr. Young before trial.

¶ 49        This appeal followed.

¶ 50                                    II. ANALYSIS

¶ 51                          A. Proceedings Under the Act

¶ 52          Our General Assembly created a three-stage process by which a petitioner may

assert claims a substantial denial of his or her constitutional rights occurred during the

proceedings that led to his or her conviction. See 725 ILCS 5/122-1 *et seq.* (West 2014). At the

first stage of proceedings, a petition is filed in the circuit court. *People v. Andrews*, 403 Ill. App.

3d 654, 658, 936 N.E.2d 648, 652 (2010). The court then examines the petition to determine

whether the petition's claims are frivolous or patently without merit. *Id.* If the court finds the

petitioner's claim frivolous or patently without merit, the court shall dismiss the petition. 725

ILCS 5/122-2.1(a)(2) (West 2014).

¶ 53          A petition will survive the first stage and advance to the second stage when it

asserts a claim that is not frivolous or patently without merit or, as here, when the circuit court

fails to make a first-stage ruling within 90 days of the petition's filing. See 725 ILCS

5/122-2.1(a), (b) (West 2014). At the second stage, counsel may be appointed, and an amended

petition may be filed. *Andrews*, 403 Ill. App. 3d at 658, 936 N.E.2d at 653. The State has the

option of answering the petition or moving to dismiss it. 725 ILCS 5/122-5 (West 2014). If the

State answers the petition or the circuit court denies the State's motion to dismiss, the proceeding

advances to the third stage, in which an evidentiary hearing may be held and defendant may

present evidence to support his claim. See 725 ILCS 5/122-6 (West 2014); see also *Andrews*, 403

Ill. App. 3d at 658-59, 936 N.E.2d at 653. In this case, two of defendant's claims advanced to

third-stage proceedings, where defendant was afforded the opportunity to call witnesses and

present evidence. See 725 ILCS 5/122-6 (West 2014).

¶ 54                    B. Defendant's Claim of Actual Innocence

¶ 55        To succeed on a claim of actual innocence, the petitioner "must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96, 996 N.E.2d 617. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.* ¶ 97. "New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial." *People v. Davis*, 2012 IL App (4th) 110305, ¶ 62, 966 N.E.2d 570. "[T]he conclusiveness of the new evidence is the most important element of an actual[-]innocence claim." *People v. Sanders*, 2016 IL 118123, ¶ 47, 47 N.E.3d 237.

¶ 56        A circuit court's decision to deny relief after an evidentiary hearing is reviewed for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. We will find a decision manifestly erroneous when we find the opposite conclusion is clearly evident. *Id.*

¶ 57        On appeal, defendant contends the trial court failed to consider all evidence in deciding the new evidence was not so conclusive it would probably change the result on retrial. Defendant first points to the medical literature that "describe instances where two[-]handed chest compressions caused rib fractures in infants." Defendant also emphasizes literature presented by Dr. Case, which he contends "leads to reasonable doubt [he] may have inadvertently caused injury" to Galen. Last, defendant stresses Dr. Young's testimony highlighting problems with Dr. Bowman's report, particularly the failure to describe blood in the abdomen.

¶ 58        Upon our review of the record, we find the opposite conclusion, the evidence was so conclusive it would probably change the outcome on retrial, is not clearly evident.

Defendant's reliance on the medical literature is not convincing. In his appellant brief, he points to two papers. The first noted (1) CPR had "been proposed as a cause of rib fractures" and (2) "[a]n analysis of infants who were discovered during autopsy to have rib fractures and had received 2-handed chest compressions antemortem suggested that 2-handed CPR is associated with anterior-lateral rib fractures of the third to sixth ribs." Emalee G. Flaherty, *et al.*, *Evaluating Children with Fractures for Child Physical Abuse*, 133(2) Pediatrics 477, 478 (Feb. 2014). However, the very next sentence states, "In this small study, no posterior rib fractures were observed." *Id.* It also concluded not that rib fractures to children would result from two-handed CPR but that "[a]dditional research is needed to examine the relationship between 2-handed CPR technique and rib fractures." *Id.* Such conclusions are hardly suggestive of conclusive evidence of actual innocence. The paper does not conclude two-handed CPR causes rib fractures, much less injuries to the extent of those inflicted on Galen.

¶ 59　　　　The other paper cited by defendant also fails to undermine the circuit court's decision the evidence is not conclusive. For example, the paper lists two 1962 cases where massive lacerations of the liver were reported after CPR was performed, but the paper identifies those cases as "alleged post-CPR injuries." The paper further notes the "determination was questionable" and concludes "primary blunt force abdominal injuries due to nonvehicular accidental blunt abdominal trauma or CPR occur very rarely, if at all." Eroston A. Price, M.D., *et al.*, *Cardiopulmonary Resusciation-Related Injuries and Homicidal Blunt Abdominal Trauma in Children*, 21(4) The American Journal of Forensic Medicine and Pathology 307, 310 (Dec. 2000).

¶ 60　　　　The testimony of Dr. Young, when considered with the literature or alone, is also

- 24 -

insufficient to show the trial court's determination was manifestly erroneous. Dr. Young did not conclude Galen's injuries were caused by defendant's resuscitation efforts but only that those injuries were consistent with the testimony CPR was attempted. In contrast, three forensic pathologists testified definitively at trial resuscitation efforts could not have caused Galen's injuries. Dr. Case reiterated that position at the evidentiary hearing. While Dr. Young relied on the amount of blood found in Galen's abdomen as evidence the liver injury occurred after blood was no longer circulating in Galen, Dr. Case opined to the contrary. She testified the microscopic evidence established the immune response was occurring when Galen died, meaning the injuries did not occur after Galen died. The trial testimony of Dr. Ralston, defendant's own witness, supports this conclusion. Although the two disagreed as to the timing of Galen's injuries, Dr. Ralston's testimony shows the immune response was occurring when Galen died. In contrast to Dr. Young's conclusion the abdomen contained a small amount of blood, Dr. Case testified the photographs showed "a very liquid blood in the abdominal cavity" and "in the soft tissue *** there is a lot of soft tissue hemorrhaging[.]" Moreover, Dr. Case testified Dr. Young was no longer permitted to perform autopsies on children in Missouri and the medical literature supported her conclusion both trained and *untrained* CPR on children could not have produced Galen's injuries. Given Dr. Case's testimony and the conclusions of two other forensic pathologists that directly contradicted Dr. Young's conclusions, we cannot find the trial court erred in finding Dr. Young's testimony and literature would not probably change the result on retrial.

¶ 61            C. Defendant's Claim of Counsel's Ineffectiveness

¶ 62            Defendant next argues he was denied the effective assistance of counsel when his

trial counsel, Fultz, failed to investigate and pursue a claim CPR caused Galen's injuries. Defendant contends counsel failed to investigate the circumstances of how he performed CPR, pointing to a statement by Brady made under oath before his first trial that defendant was "trying real hard" while performing chest compressions on Galen and emphasizing Fultz did not ask defendant to demonstrate his actions. Defendant further points to Fultz's statement he did not want to explain Galen's injuries to the jury and confuse the fact with more than one theory. Defendant argues pursuing both theories would not have confused the jury as the lack of blood in the abdomen supports the theory Galen had no circulation when the liver injury occurred.

¶ 63        Criminal defendants have the constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A defendant asserting he was denied that right must establish (1) his or her counsel's representation fell below an objective standard of reasonableness and (2) there exists a reasonable probability the outcome of the proceeding, absent counsel's error, would have been different. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 37, 83 N.E.3d 671. Defendant carries the burden of proving this claim. *Id.* The failure to prove either prong precludes a finding counsel was ineffective. *Id.*

¶ 64        When a petition advances to a third-stage evidentiary hearing, this court will not reverse a circuit court's determination, where fact-finding and credibility assessments are made, absent manifest error. *People v. Pendleton*, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 1008 (2006). In consideration of whether counsel's representation fell below an objective standard of reasonableness, we are mindful our scrutiny of counsel's performance must be highly deferential, and we " 'must indulge a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance.' " See *People v. Peeples*, 205 Ill. 2d 480, 540, 793 N.E.2d

- 26 -

641, 677 (2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

¶ 65        The trial court did not commit manifest error when it found defense counsel's conduct was within an objective standard of reasonableness. The expert testimony in the case before trial ruled out resuscitation efforts as the cause of Galen's death. This included testimony by defendant's own retained expert. In addition, defendant's expert further testified the microscopic evidence established the injuries occurred one to two days before Galen's death and there were injuries to Galen that could not be explained by resuscitation efforts. Given this evidence, it was not unreasonable to not pursue CPR as a theory of the case. In addition, it was not unreasonable to not pursue the CPR theory in the alternative to the theory Galen's injuries did not occur when defendant was present. First, the expert testimony did not support the resuscitation-efforts theory. Second, it was not unreasonable for defense counsel to not suggest to the jury the defense and the defense expert might be wrong on the timing of Galen's injuries.

¶ 66                    D. Defendant's Claim of a *Brady* Violation

¶ 67        In his postconviction petition, defendant asserted the State violated his due-process rights by failing to disclose information related to Dr. Bowman's competency, preventing him from challenging her expertise as an expert witness or from impeaching her testimony. Defendant cited documentation showing the State was aware of, or should have been aware of, an investigation into Dr. Bowman, including newspaper articles and various letters questioning Dr. Bowman's competency.

¶ 68        This argument involves a claim that was dismissed at the second stage of proceedings under the Act. At the second stage of proceedings under the Act, the task of the circuit court is to determine whether the petition's allegations sufficiently establish a

constitutional infirmity necessitating relief. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 15, 964 N.E.2d 1139. The burden of making a substantial showing a constitutional violation occurred is defendant's. See *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008. A circuit court may dismiss a petition at the second stage only when the allegations in that petition, liberally construed in light of the trial record, do not make a substantial showing of a constitutional violation. *Snow*, 2012 IL App (4th) 110415, ¶ 15, 964 N.E.2d 1139. We review such a dismissal *de novo*. *Id.*

¶ 69        We find defendant failed to make a substantial showing his constitutional rights were violated. In his postconviction petition, defendant supported his claim with documentation, including the following: (1) a May 2010 newspaper article reporting several county coroners preferred not to work with Dr. Bowman after her questionable work in investigating the death of a toddler, Anakin Credit; (2) Dr. Bowman's April 2008 autopsy report of Credit, in which she opined his death was caused by a rare form of cancer; (3) an October 2009 letter from Dr. Case, indicating Dr. Case opined Credit's cause of death was homicide from asphyxiation; (4) an April 2011 newspaper article reporting the Sangamon County coroner agreed to resign after a criminal investigation into her office after it was determined Credit did not die of natural causes as Dr. Bowman opined; (5) a March 2011 newspaper article reporting Dr. Bowman had been removed as the pathologist for the Sangamon County coroner's office after her qualifications were questioned; and (6) a March 2011 letter from Sangamon County officials requesting the Sangamon County coroner replace Dr. Bowman due to a lack of confidence in her abilities.

¶ 70        Prosecutors play a special rule in the search for truth in criminal trials. *People v. Beaman*, 229 Ill. 2d 56, 73, 890 N.E.2d 500, 510 (2008). A prosecutor's interest is that justice is done. *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). Under *Brady*, 373 U.S. at 83, a

prosecutor violates a defendant's constitutional right to due process when that prosecutor fails to disclose evidence favorable to the defendant and material to the question of guilt or punishment. *Beaman*, 229 Ill. 2d at 73, 890 N.E.2d at 510. *Brady* is violated when the prosecutor fails to comply with his "duty to learn of favorable evidence known to other government actors, including the police." *Id.*

¶ 71    To establish a prosecutor failed to comply with *Brady*, the defendant must show "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *Id.* at 73-74. We will find "[e]vidence is material if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74.

¶ 72    Defendant has not shown the nondisclosed evidence is material as there is no reasonable probability the result of the trial would have been different had that evidence been disclosed. The record establishes defense counsel was aware of questions regarding Dr. Bowman's competency. Testimony heard by the jury during defendant's trial was that Dr. Bowman was not board certified as a pathologist and there were concerns by the police and the state's attorney's office regarding working with Dr. Bowman. Testimony further established Dr. Bowman had been replaced because of these concerns.

¶ 73                                   III. CONCLUSION

¶ 74    We affirm the trial court's judgment.

¶ 75    Affirmed.